Aubrey Dennis ADAMS, Jr.,
Petitioner-Appellant,

v.

Louie WAINWRIGHT, Jim Smith,
Respondents-Appellees.

No. 86–3207.

United States Court of Appeals,
Eleventh Circuit.

Nov. 13, 1986.

Mark E. Olive, David A. Reiser, Tallahassee, Fla., Ronald J. Tabak, Skadden, Arps, Slate, Meagher & Flom, New York City, Kenneth M. Hart, Tallahassee, Fla., for petitioner-appellant.

Margene Roper, Asst. Atty. Gen., Dept. of Legal Affairs, Richard B. Martell, Asst. Atty. Gen., Daytona Beach, Fla., for respondents-appellees.

Before RONEY, Chief Judge, FAY and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Petitioner, Aubrey Dennis Adams, was convicted in October 1978 of the first degree murder of eight-year-old Trisa Gail Thornley and was sentenced to death in January 1979. His conviction and sentence were affirmed by the Florida Supreme Court, *Adams v. State*, 412 So.2d 850 (Fla.), *cert. denied*, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982), and his motions for post-conviction relief pursuant to Fla.R. Crim.P. 3.850, *Adams v. State*, 456 So.2d 888 (Fla.1984); *Adams v. State*, 484 So.2d 1216 (Fla.1986), and petition for writ of habeas corpus in the Supreme Court of Florida, 484 So.2d 1211 (Fla.1986), *cert. denied*, —— U.S. ——, 106 S.Ct. 1506, 89 L.Ed.2d 906 (1986), were denied.

Adams' first petition for a writ of habeas corpus in the district court was denied without evidentiary hearing and this Court affirmed. *Adams v. Wainwright*, 764 F.2d 1356, *reh'g denied*, 770 F.2d 1084 (11th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986). This appeal is taken from the district court's denial

of Adams' second habeas petition on March 7, 1986.[1]

The district court found that all of the claims raised in Adams' second petition were barred, either because of procedural default in the state courts or because raising them in this second habeas petition constituted an abuse of the writ. We affirm in part and reverse in part, with instructions that the district court issue the writ of habeas corpus unless the State of Florida conducts a new sentencing proceeding before an untainted jury.

## I. DISCUSSION

In this appeal Adams raises five claims: (1) violation of *Caldwell v. Mississippi* through statements by the trial judge that misled the jury as to their role in the sentencing process; (2) incompetency to stand trial; (3) ineffective assistance of counsel through failure to provide Adams with a competent psychiatric expert; (4) ineffective assistance of counsel through failure to challenge the voluntariness of Adams' confession; and (5) ineffective assistance of counsel through failure to consult an expert pathologist to rebut certain testimony of the State's expert witnesses.

### A. *Caldwell* Claim

At the beginning of jury selection for Adams' trial, the judge instructed the initial panel of prospective jurors as follows regarding the nature and effect of the jury's recommended sentence in a capital murder trial:

> The Court is not bound by your recommendation. The ultimate responsibility for what this man gets is not on your shoulders. It's on my shoulders. You are merely an advisory group to me in Phase Two. You can come back and say, Judge, we think you ought to give the

man life. I can say, I disregard the recommendation of the Jury and I give him death. You can come back and say, Judge, we think he ought to be put to death. I can say, I disregard your recommendation and give him life. So that this conscience part of it as to whether or not you're going to put the man to death or not, that is not your decision to make. That's only my decision to make and it has to be on my conscience. It cannot be on yours.

The judge gave a substantially similar explanation of the jury's role in the sentencing process each time new prospective jurors were seated in the jury box.[2] He also interrupted counsel's voir dire of prospective jurors on two occasions to reiterate that the court, and not the jury, was responsible for sentencing. Four members of Adams' jury heard these remarks eleven times, three heard the remarks nine times, one heard them six times, one heard them five times, and the remaining three jurors heard them four times.

Adams argues these statements by the judge violated the Eighth Amendment as interpreted in *Caldwell v. Mississippi*, which held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985). The district court did not reach the merits of this claim, finding that the failure to raise the claim in Adams' first habeas petition constituted an abuse of the writ, and that the claim also had been procedurally defaulted in the state courts. The district court's findings were based on its determination that Adams' claim "does not derive any merit from the

---

1. The district court also denied Adams' motion pursuant to Fed.R.Civ.P. 60(b) for relief from the judgment denying his first habeas petition. Adams subsequently moved for voluntary dismissal of his appeal of denial of that motion and this Court denied a certificate of probable cause with regard to that motion and dismissed that appeal on May 23, 1986.

2. The judge had intended to give this explanation to the entire jury venire before the selection process began, but he forgot to do so, thereby necessitating the procedure actually followed. The explanation was given on nine separate occasions.

*Caldwell* decision" because the trial judge, and not the jury, is the sole sentencer in Florida. The district court rejected Adams' argument that the jury plays a critical role in the sentencing process in Florida because the court thought it significant that, while a trial judge in Florida is limited in his ability to override a jury verdict recommending life imprisonment, "[n]othing in Florida law suggests that a similar presumption of correctness is due a jury recommendation of a death sentence." Because we find that *Caldwell* is applicable to statements that diminish the sense of responsibility of the advisory jury for its recommended sentence under the Florida system, we find that the district court erred in dismissing this claim on the grounds of abuse of the writ and state procedural default. Further, we find that the judge's statements in this case created an intolerable danger that the jury's sense of responsibility for its advisory sentence was diminished, thereby rendering Adams' death sentence unreliable in violation of the Eighth Amendment.

1. *Applicability of Caldwell to Florida's Sentencing Scheme*

■ The district court's determination that *Caldwell* was inapplicable to Adams' case was based on an inaccurate assessment of the role of the jury in the Florida system and a misunderstanding of the significance of the jury override. Under Florida's trifurcated procedure in capital felony cases, after a jury determination of guilt, a separate sentencing proceeding is held before the jury, after which the jury renders an advisory sentence based on its weighing of aggravating and mitigating circumstances. Fla.Stat.Ann. § 921.141(1)(2) (1985). Although the trial judge must then independently weigh the aggravating and mitigating circumstances and render sentence, the jury's recommendation, which represents the judgment of the community as to whether the death sentence is appropriate in a given case, is entitled to great weight, *McCampbell v. State,* 421 So.2d 1072, 1075 (Fla.1982) (per curiam), and may be rejected by the trial judge only if the facts are

"so clear and convincing that virtually no reasonable person could differ." *Tedder v. State,* 322 So.2d 908, 910 (Fla.1975) (per curiam). This limitation on the judge's exercise of the jury override provides a "crucial protection" for the defendant. *Dobbert v. Florida,* 432 U.S. 282, 295, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977).

In light of the limited nature of the jury override, it is clear that the district court's reliance on the judge's status as the "sole sentencer" was misplaced. While the judge is in fact the only entity that imposes sentence under the Florida scheme, his role is to serve as "a buffer where the jury allows emotion to override the duty of a deliberate determination" of the appropriate sentence. *Cooper v. State,* 336 So.2d 1133, 1140 (Fla.1976), *cert. denied,* 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977). Because of the deference given the jury's recommended sentence, that recommendation establishes the "parameters" for all subsequent consideration of the appropriate sentence, including that of the trial judge, and makes "[t]he jury's role in an advisory sentencing proceeding ... critical." *Adams,* 764 F.2d at 1364.

Further, the district court's reasoning that the jury did not play a critical role in Adams' sentencing because no presumption of correctness attaches under Florida law to a jury recommendation of death misses the importance of both the jury override and *Caldwell.* The important consideration is not whether the *Tedder* presumption of correctness attaches to a sentence recommending death, but whether the judge's statements made it less likely that the jury would recommend life. As this Court recognized in *Adams I,* "[e]very error in instruction which makes it less likely that the jury will recommend a life sentence to some degree deprives the defendant of the protections afforded by the presumption of correctness that attaches to a jury's verdict recommending life imprisonment." 764 F.2d at 1364. When the error involves statements that diminish the jury's sense of responsibility for its sentence, *Caldwell* makes it clear that an impermissible likeli-

hood the jury will be biased in favor of rendering a sentence of death is created. 105 S.Ct. at 2640.[3]

Clearly, then, the jury's role in the Florida sentencing process is so crucial that dilution of its sense of responsibility for its recommended sentence constitutes a violation of *Caldwell.* In fact, the Florida Supreme Court recently has recognized that the concerns expressed in *Caldwell* apply to the Florida sentencing scheme, stating that "[i]t is appropriate to stress to the jury the seriousness which it should attach to its recommendation" and that "[t]o do otherwise would be contrary to *Caldwell v. Mississippi* and *Tedder v. State.*" *Garcia v. State,* 492 So.2d 360, 367 (Fla.1986) (citations omitted).[4]

### 2. *Procedural Bar*

■ A district court need not consider a claim raised for the first time in a second habeas petition, unless the petitioner establishes that the failure to raise the claim earlier was not the result of intentional abandonment or withholding or inexcusable neglect. Rule 9(b) of the Rules Governing

Section 2254 Cases in the United States District Courts; *Witt v. Wainwright,* 755 F.2d 1396, 1397 (11th Cir.1985). Consideration of a claim also can be barred by failure to comply with state procedural rules, absent a showing of cause for, and prejudice resulting from, such failure. *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *accord, Engle v. Isaac,* 456 U.S. 107, 110, 102 S.Ct. 1558, 1562, 71 L.Ed.2d 783 (1982). A significant change in applicable law, however, can both excuse the failure to raise a claim in a previous petition, *Witt,* 755 F.2d at 1397, and establish cause to excuse procedural default in state court. *Reed v. Ross,* 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984).

■ Because *Caldwell* represents a significant change in the law and was not decided until after dismissal of Adams' first habeas petition, we find that raising this claim in a successive habeas petition does not constitute an abuse of the writ. Further, as the legal basis for Adams' claim was not reasonably available to Adams until the *Caldwell* decision,[5] the dis-

---

**3.** We also note that the district court's interpretation of Florida law seems inaccurate. Although the weight to be given the jury's recommendation has most often been considered in Florida in the context of a judge-imposed death sentence despite a jury recommendation of life imprisonment, we have found nothing in Florida law to indicate that only jury recommendations of life imprisonment are entitled to great weight. *See, e.g., LeDuc v. State,* 365 So.2d 149, 151 (Fla.1978), *cert. denied,* 444 U.S. 885, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979) (per curiam) (on appeal of death sentence recommended by jury and imposed by judge, court stated "[t]he primary standard for our review of death sentences is that the recommended sentence of a jury should not be disturbed if all relevant data was considered, unless there appear strong reasons to believe that reasonable persons could not agree with the recommendation," citing *Tedder* ); *Chambers v. State,* 339 So.2d 204, 208 (Fla.1976) (England, J., concurring) (discussing both cases where recommendation was life and recommendation was death as espousing the same guidelines regarding the jury's role). As discussed above, however, even if Florida did make this distinction, the important consideration is not whether a presumption of correctness attaches to a recommendation of death, but whether the judge's statements made it less likely that a life sentence would be recommended.

**4.** In the earlier case of *Darden v. State,* 475 So.2d 217 (Fla.1985), the Florida Supreme Court had stated in rejecting a *Caldwell* claim that "[w]e do not find such egregious misinformation in the record of this trial [as was present in *Caldwell* ], and we also note that Mississippi's capital punishment statute vests in the jury the ultimate decision of life or death, whereas, in Florida, that decision resides with the trial judge." *Id.* at 221. While this statement suggests that the Florida Supreme Court considers the differences between the Mississippi and Florida systems relevant to the consideration of a *Caldwell* claim, its later decision in *Garcia* makes it clear that it does not consider those differences sufficient to make *Caldwell* inapplicable to the Florida sentencing procedure.

**5.** A new development in the law is sufficient to constitute "cause" for a procedural default only if the defendant did not have the legal tools available to construct the claim previously because "[w]here the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default." *Engle,* 456 U.S. at 133–34, 102 S.Ct. at 1574–75. We have found no law indicating that this type of claim

trict court erred in finding that Adams had failed to establish cause for any procedural default in the state courts.[6] Adams also was prejudiced by the failure to raise this claim. As discussed below, the judge's statements to Adams' jury clearly violated the principles enunciated in *Caldwell,* thereby rendering the jury's recommended sentence unreliable.[7]

was being raised by other defendants at the time of Adams' sentencing and his appeal. Despite the state's argument to the contrary, the *Tedder* decision itself clearly did not provide sufficient basis for raising this claim, as *Tedder* dealt only with the weight to be given the jury's recommended sentence and not with the constitutional implications of statements that diminish the jury's sense of responsibility for its sentence.

Further, the only Supreme Court pronouncement relevant to Adams' claim before *Caldwell* was *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), which upheld a jury instruction informing the jury that the Governor could commute a life sentence without parole. *Id.* at 1014, 103 S.Ct. at 3460. This decision, if anything, seemed to sanction statements such as those made by the judge at Adams' trial. *Cf. Reed,* 468 U.S. at 17, 104 S.Ct. at 2911 (one way in which new constitutional rule representing clear break with the past may emerge is when the decision disapproves a practice that the Court's former cases arguably have sanctioned). In fact, the *Caldwell* Court found it necessary to distinguish *Ramos,* which had been relied upon by the Mississippi Supreme Court in upholding Caldwell's death sentence, in reaching its decision. *Caldwell,* 105 S.Ct. at 2643.

**6.** It is doubtful that procedural default is present in this case because it does not appear that the Florida Supreme Court's holding that Adams' *Caldwell* claim was barred from consideration in a post-conviction proceeding because of failure to raise it on direct appeal, *Adams v. State,* 484 So.2d 1216, 1217 (Fla.1986), constitutes "an independent and adequate" basis under state law for the denial of relief. *Sykes,* 433 U.S. at 87, 97 S.Ct. at 2506; *Spencer v. Kemp,* 781 F.2d 1458, 1463 (11th Cir.1986). Under Florida law, claims based on constitutional changes in the law since the time of a petitioner's direct appeal of sufficient magnitude to warrant retroactive application are cognizable in Rule 3.850 proceedings, *see Witt v. State,* 387 So.2d 922, 929, *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980), as are claims involving fundamental errors. *See Palmes v. Wainwright,* 460 So.2d 362, 365 (Fla.1984). In fact, Adams' *Caldwell* claim is the very type of claim for which Florida created the Rule 3.850 procedure. *See Witt,* 387 So.2d at 927 (genesis of Rule 3.850 was Florida's desire to provide a mechanism for petitioners to raise challenges based on major constitutional changes in the law). Therefore, the Florida Supreme Court's decision either must rest on an incorrect determination as to the applicability of *Caldwell,* or represents application of a procedural bar with regard to a type of claim that Florida does not regularly and consistently bar. *See Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985) (when application of state procedural bar depends on an antecedent ruling as to whether federal constitutional error has been committed there is no independent and adequate state law ground); *Spencer,* 781 F.2d at 1470 (state procedural rule that is sporadically applied is not independent and adequate state ground).

**7.** The state argues that prejudice cannot be demonstrated because (1) the comments were a correct assessment of Florida law, (2) the judge's instructions to the jury as to aggravating and mitigating factors and their weighing would make it clear the jury should render its advisory sentence on the individual circumstances of the case and (3) the comments were made during voir dire, when the judge was merely trying to give the prospective jurors some sense of the sentencing structure.

As discussed above, however, the judge's comments were misleading because they left the jury with a false impression as to the significance of their role in the sentencing process. Further, the judge's instructions regarding mitigating and aggravating circumstances did not cure the misleading statements, because there was no withdrawal or correction of those statements. *Cf., Caldwell,* 105 S.Ct. at 2645 n. 7 (prosecutor's later statements that jury played important role did not cure misleading statements because prosecutor did not retract or undermine those statements). Although the trial judge instructed the jury during the penalty phase not to "act hastily or without due regard to the gravity of these proceedings" and told it to "carefully weigh, sift and consider the evidence, and all of it, realizing that human life is at stake," nothing he said corrected the jury's misunderstanding of the significance of its recommendation. In fact, at the beginning of the penalty phase, the judge reinforced his prior comments by stating that "the final decision as to what punishment shall be imposed rests solely upon the Judge of this Court." He also made a similar remark at the beginning of the penalty phase jury instructions. Further, the fact the jury heard these statements during voir dire does not mean that the statements did not influence the jury. These statements were not isolated or insignificant comments. They were made by the judge at a time when he purportedly was informing the prospective jurors as to their role

### 3. *Merits of the Caldwell Claim*

■ *Caldwell* involved prosecutorial comments during closing argument informing the jury that its decision was not final because it was subject to automatic review by the state supreme court. 105 S.Ct. at 2638. The Supreme Court found that these comments violated the Eighth Amendment because they diminished the reliability of the jury's "determination that death is the appropriate punishment in a specific case" and created a bias in favor of imposition of the death penalty. *Id.* at 2640. Review of Adams' case in light of the concerns expressed in *Caldwell* shows that the judge's statements to Adams' jury created a similar unreliability with regard to the determination that death was the appropriate punishment for Adams.

The *Caldwell* Court found that delegation of sentencing responsibility to the appellate court would not simply postpone a defendant's right to a fair determination of the appropriateness of his death, but would deprive him of that right because the appellate court does not "confront and examine the individuality of the defendant," but merely reviews the jury determination, giving that determination a presumption of correctness. *Id.* at 2640–41. Unlike the appellate court in *Caldwell*, the Florida judge does have the opportunity to view witnesses and hear evidence. However, Florida has determined that it is the jury which should perform the task of reconciling conflicting evidence and weighing the aggravating and mitigating factors. *Chambers v. State*, 339 So.2d 204, 208–09 (Fla.1976) (England, J., concurring). Therefore, much like the Mississippi appellate court, the Florida trial judge is limited in his ability to override the jury recommendation. The judge's statements to Adams' jury indicating he was free to ignore the jury's recommendation thus were misleading as to the nature of his task in much the same way that the statements in *Cald-*

*well* were misleading as to the role of appellate review.

The *Caldwell* Court noted that the danger of bias in favor of the death penalty is created by the possibility that a jury unconvinced that death is the appropriate punishment might nevertheless impose the death penalty as a message of extreme disapproval of the defendant's acts if it believed that its error in doing so would be corrected on appeal. 105 S.Ct. at 2641. The danger that Adams' jury, relieved of responsibility for determining his fate, would feel free to express its outrage at the senseless killing of an eight-year-old girl clearly was present.

The *Caldwell* Court also found that the prejudicial effect of the prosecutor's argument was increased by the fact jurors would be likely to find minimization of their otherwise difficult role of determining whether another should die attractive, particularly when they were told that the alternative decision makers were legal authorities that they might view as having more of a right to make such an important decision. *Id.* at 2641–42. In Adams' case, the judge clearly told the jurors that he was the one assigned this decision and that the jurors should not worry about the "conscience part of it." Indeed, because it was the trial judge who made the misleading statements in this case, representing them to be an accurate description of the jury's responsibility, the jury was even more likely to have believed that its recommended sentence would have no effect and to have minimized its role than the jury in *Caldwell*. *Cf. id.* at 2645 (noting importance of fact trial judge agreed with prosecutor's remarks).

Finally, as in *Caldwell*, we cannot say that the judge's efforts to minimize the jury's sense of responsibility for Adams' sentence had no effect on the jury's sentencing decision. *See id.* at 2646.[8] Adams'

---

in the trial, the statements were made repeatedly, and the judge informed the prospective jurors that the substance of these statements was "the most important thing to remember in Phase Two."

8. It is very clear that the judge's statements were aimed at relieving prospective jurors of any concerns that they might have about recommending a death sentence. Not only did he repeatedly stress to the prospective jurors that

case is not one in which the only reasonable sentence would have been death. The judge found an equal number (three) of mitigating factors and aggravating factors. *Adams v. State,* 412 So.2d at 854. Thus, the relative weight placed on those factors by the jury in Adams' case was especially important, as it is highly unlikely that its recommendation of either life or death would be overturned by the judge.[9] In other words, Adams' case fell within the area of deference to the jury's recommended sentence which makes the need for reliability in that recommended sentence of critical importance.

As in *Caldwell,* the real danger exists that the judge's statements caused Adams' jury to abdicate its "awesome responsibility" for determining whether death was the appropriate punishment in the first instance. Because in Adams' case the jury's recommended sentence of either life or death would fall within the wide area of deference established by the *Tedder* standard, Adams might be executed although no sentencer had ever made a considered determination that death was the appropriate sentence if his sentence were allowed to stand. *See Caldwell,* 105 S.Ct. at 2641. Therefore, we find that the trial judge's seriously misleading statements regarding the importance and effect of the jury's recommended sentence created an impermissible danger that the recommended sentence was unreliable and, consequently, that Adams' death sentence was unreliable, and reverse the district court's denial of Adams' habeas petition.

## B. Competency to Stand Trial

Adams asserts he was incompetent to stand trial because of his amnesia regarding most of the events surrounding the crime. This claim was raised in Adams' first petition for habeas corpus and was decided on the merits. When a claim has been decided on the merits in a prior habeas proceeding, it may be dismissed by the district judge, unless the petitioner establishes that the ends of justice would be served by reconsideration of the claim. *Witt,* 755 F.2d at 1397. Whether the ends of justice will be served is determined by objective factors, such as whether there was a full and fair hearing on the original petition or whether there was an intervening change in the facts of the case or the applicable law. *Id.; accord, Sanders v. United States,* 373 U.S. 1, 17, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963).

Adams asserts that the interests of justice require a rehearing of this claim because of new evidence in the form of two comprehensive psychiatric and psychological evaluations not presented to the district court in Adams' previous petition. The only reason given for not obtaining these reports earlier, however, is that Adams' former habeas counsel was appointed when execution was imminent and therefore did not have time to obtain detailed psychiatric and psychological reports. Failure to present a claim in a previous habeas petition because of the haste with which the petition was prepared does not prevent that failure from constituting an abuse of the writ. *Antone v. Dugger,* 465 U.S. 200, 206 n. 4, 104 S.Ct. 962, 965 n. 4, 79 L.Ed.2d 147 (1984) (per curiam). This is true even though counsel was appointed when execution was imminent and counsel therefore did not have sufficient time to familiarize

---

they should not worry about the "conscience part of it" but, when two prospective jurors indicated that their opposition to the death penalty would keep them from recommending a death sentence under any circumstances, he probed the strength of their convictions in terms of whether they could not "vote for a recommendation to the Judge for a death penalty, even though the Judge is not bound to follow it."

**9.** In fact, Justices Boyd and McDonald dissented from the Florida Supreme Court's affirmance of Adams' sentence and Justice Boyd filed an opinion in which he indicated that Adams' death sentence was disproportionate in light of prior similar cases. *Adams v. State,* 412 So.2d 850, 857 (Fla.1982) (Boyd, J., concurring in part and dissenting in part). Justice McDonald dissented from affirmance of the denial of Adams' first Rule 3.850 motion on similar grounds. *Adams v. State,* 456 So.2d 888, 891 (Fla.1984) (McDonald, J., dissenting).

himself with the case. *Id.* The rationale of *Antone* is equally applicable to the situation where a claim is presented and considered, but the petitioner asserts that significant evidence, although available, was not obtained because of time constraints.[10] The district court did not err in refusing to reconsider this claim.

Further, we agree with the district court's conclusion that the new reports "do nothing to vitiate this Court's prior determination that Petitioner has not raised a legitimate doubt that he was capable of fully understanding the proceedings against him and cooperating meaningfully with his attorney in preparing his defense." As the district court noted, the new reports merely draw the obvious conclusions as to the effects of Adams' partial amnesia with regard to the events surrounding the crime on his ability to participate in the trial. As we stated in *Adams I,* "[w]hile a defendant's inability to remember his participation in a crime may have some bearing on whether he is mentally incompetent, it is possible for a defendant to have no recall of his involvement in a crime and yet fully understand the proceedings against him and cooperate meaningfully with his attorney in his defense." 764 F.2d at 1361.

## C. Ineffective Assistance of Counsel Claims

■ Adams asserts three claims of ineffective assistance of counsel. The first claim—failure to provide Adams with a competent psychiatric examination—was raised in Adams' first habeas petition and the district court found that the ends of justice did not require its reconsideration. The other two claims—failure to challenge the voluntariness of Adams' confession and failure to consult a pathologist to rebut the state's expert testimony—were raised for

the first time in the second petition. The district court found that the failure to challenge the voluntariness of Adams' confession had been raised in Adams' first 3.850 motion and then intentionally abandoned on appeal so that raising that issue for the first time in a successive petition constituted an abuse of the writ and that the claim regarding failure to consult a pathologist was procedurally barred because it was not raised in the appropriate state court proceeding.

Adams asserts that the first two claims are based on the new reports which were not available at the time of the first petition because of the haste with which the first petition was prepared. As discussed above, haste in preparation of an initial petition neither excuses the failure to raise a claim in a prior petition nor excuses the failure to present evidence available at the time of that petition. Adams offers no reason why the third claim was not presented in the appropriate state court proceeding, nor does any reason become apparent from review of the record. Therefore, the district court did not err in dismissing these claims.

Further, even if the claims were not barred, we agree with the district court's determination that they are without merit. To establish ineffective assistance of counsel, the petitioner must show both that counsel acted in a manner professionally unreasonable under the circumstances and that prejudice resulted in the form of a reasonable probability that, but for the challenged conduct, the result of the proceedings would have been different. *Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064–65, 2068, 80 L.Ed.2d 674 (1984). The record does not indicate that the actions of Adams' trial counsel constitute ineffective assistance under the *Strickland* test.

---

**10.** We also note that the new reports do not differ in kind from the psychological evidence available to the district court on Adams' first petition and are drawn from information available at the time of that first petition. Therefore, they are not the type of new evidence that would justify reconsideration of Adams' incompetency claim. *Cf. Smith v. Kemp,* 715 F.2d 1459, 1468–69 (11th Cir.1983) (denying recon-

sideration of habeas claim when new evidence consisted of modified and expanded version of statistics rejected by court in adjudicating merits of first petition and contained additional conclusions drawn from same records available at time of first petition) (court noted that otherwise unsuccessful habeas petitioner could file successive petitions by offering additional arguments and conclusions based on ongoing study).

### 1. Competent Psychiatric Evaluation at the Time of Trial

Adams asserts that his trial counsel's ineffective assistance deprived him of a competent psychiatric evaluation at trial that would have revealed critical mitigating evidence and evidence of incompetency to stand trial. He argues his trial counsel should have had the private psychiatrist who examined Adams at the time of trial conduct a more thorough examination regarding Adams' competency, his ability to conform his conduct to the law at the time of the offense, and the voluntariness of his confession.

This Court held in *Adams I* that no prejudice resulted to Adams from his trial counsel's failure to pursue an incompetency claim because neither the exam that was conducted before trial nor the post-trial examination raised a real, substantial, and legitimate doubt as to his mental competency at the time of trial. 764 F.2d at 1367. As discussed above in connection with the incompetency claim, the new reports contain nothing that would alter that determination. Further, as discussed below, trial counsel did not act in a professionally unreasonable manner in not challenging the voluntariness of Adams' confession. Therefore, we find this claim without merit.[11]

### 2. Failure to Challenge Adams' Confession

Adams asserts that his trial counsel did not effectively challenge the voluntariness of Adams' confession because, although he moved before trial to suppress the confession as involuntary, as well as on grounds of inadequate *Miranda* warnings, he only pursued the *Miranda* challenge at trial. Adams argues that competent counsel would have (1) contested the voluntariness of Adams' confession at a pretrial hearing utilizing psychiatric evidence, and (2) if unsuccessful in having the confession suppressed, would have submitted the voluntariness and reliability of the confession to the jury through appropriate jury instructions.

In order to establish an ineffective assistance of counsel claim, the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy" under the circumstances. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Our review of the record indicates that Adams has failed to overcome this presumption.[12] "[A] strategic decision to pursue less than all plausible lines of defense will rarely, if ever, be deemed ineffective if counsel first adequately investigated the rejected alternatives." *Palmes v. Wainwright*, 725 F.2d 1511, 1521 (11th Cir.1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). The record clearly shows that Adams' attorney had investigated the events surrounding Adams' confession. We cannot say on this record that his decision after that investigation to challenge the confession only on

---

**11.** Adams cites *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), in support of his claim of entitlement to a competent psychiatric expert. In *Ake*, the Supreme Court held that when a defendant demonstrates to the trial judge that his sanity at the time of the offense will be a significant factor at trial, the state must assure the defendant access to a competent psychiatrist. *Id.* at 1097. As the district court noted, *Ake* is not applicable because Adams did not make a showing at the time of trial that his sanity would be an issue and did not request a court-appointed psychiatrist. Although *Ake* does express a recognition of the importance of psychiatric evaluation in some cases, it adds nothing to Adams' ineffective as-

sistance claim, which is not based on the failure to provide a psychiatrist, but on the scope of the psychiatric examination that was conducted. *See id.* (holding does not mean defendant has constitutional right to choose a psychiatrist of his personal liking).

**12.** This Court conducts an independent review of the record in determining the ultimate question of whether a confession was voluntary, *Jurek v. Estelle*, 623 F.2d 929, 932 (5th Cir.1980), and in determining whether a petitioner was denied effective assistance of counsel. *Smith v. Wainwright*, 777 F.2d 609, 615–16, *reh'g denied*, 785 F.2d 1037 (11th Cir.1985).

*Miranda* grounds falls outside "the wide range of reasonable professional assistance."

Adams' contention that his counsel was ineffective because of failure to request a jury instruction to the effect that the jury should decide the voluntariness of the confession for themselves also is without merit. Under Florida law, once a confession is admitted into evidence, the defendant is entitled to present evidence to the jury pertaining to the circumstances under which the confession was made so the jury can determine the weight to be given the confession. *Palmes v. State*, 397 So.2d 648, 653 (Fla.), *cert. denied*, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981). The jury does not determine voluntariness of the confession; it simply determines the weight to be given a confession that the judge has determined is voluntary. *Id.* The record shows that Adams' trial counsel brought out the circumstances surrounding the confession during his cross-examination of the interrogating officers. The jury instruction given stated that "A confession voluntarily made should be given fair and unprejudiced consideration with due regard to the time and circumstances under which it was made, its harmony or inconsistency with other evidence as well as the motives shown by the evidence to have influenced the making of the confession." This instruction is consistent with Florida law and Adams' counsel was not ineffective in failing to request another, particularly one that would have been inaccurate.

3. *Failure to Obtain the Assistance of an Expert Pathologist*

At trial, the state called two pathologists who expressed their opinion that the probable cause of death of the victim was strangulation rather than manual suffocation. One expert also expressed the opinion that the victim's hands were bound before death. This testimony was relevant to the issue of premeditation, and the opinion that the victim's hands were bound before death was one of the factors the state trial judge relied upon in finding the aggravating factor that the capital felony was "especially heinous, atrocious, or cruel." *See Adams v. State*, 412 So.2d at 856 (quoting trial judge's sentencing findings). On cross-examination by Adams' trial counsel, these experts admitted that the cause of death and whether the victim's hands were bound before death could not be determined with reasonable medical certainty because of the decomposed state of the body, and one expert stated that death by suffocation was possible. Trial counsel argued these weaknesses in the state's expert testimony during closing argument. Adams argues that trial counsel should have consulted an expert pathologist to rebut the state's witnesses. In support of this contention Adams offers the affidavit of a county medical examiner, which indicates that the opinions expressed by the state witnesses had no scientific basis.

Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" and "a particular decision not to investigate must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. We agree with the district court's determination that, because the weaknesses in the testimony of the state's experts were pointed out to the jury, counsel's failure to further investigate the expert testimony was not unreasonable and the defense was not prejudiced.

II. CONCLUSION

The district court's denial of a writ of habeas corpus with regard to Adams' *Caldwell* claim is REVERSED, and this case is REMANDED to the district court with instructions to issue the writ of habeas corpus if the State of Florida does not afford Adams a new sentencing proceeding before an untainted jury. *See Lucas v. State*, 490 So.2d 943, 945–46 (Fla.1986) (error affecting jury's sentencing determination requires new sentencing proceeding before a jury).

AFFIRMED IN PART; REVERSED IN PART and REMANDED.